UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 4:06-cr-06 |
| | ) | Judge Collier/Carter |
| SANTOS SOLIS | ) | |

REPORT AND RECOMMENDATION

I. Introduction

The defendant's motion to suppress statements made to federal agents on October 10, 2004 (Doc. 104) and his motion to suppress statements obtained pursuant to a telephonic wiretap (Doc.105) are before the undersigned having been referred for a report and recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B).

A hearing was held on these motions before the undersigned on June 8, 2006. At this hearing, Asst. United States Attorney Perry Piper averred that the government does not intend to use in its case-in-chief the October 10, 2004 statements which are the subject of the defendant's first motion (Doc. 104). Given this representation, counsel for defendant, Joe Hoffer, stated his client would not pursue this particular motion to suppress. Accordingly, it is RECOMMENDED defendant's motion to suppress statements (Doc. 104) be DENIED as moot. The remaining motion concerns statements obtained when the defendant's telephone was wiretapped. Defendant avers that the affidavit used to the obtain the wiretap did not set forth probable cause and did not meet the requirements of 18 U.S.C. § 2510 *et.seq.* to show less intrusive, alternative methods of investigation were not available to the officers before issuing the order authorizing the wiretap. For the reasons stated herein, it is RECOMMENDED that the defendant's motion to suppress statements obtained

1

from the wiretap (Doc. 105) be DENIED.

## II. Relevant Facts

On September 29, 2005, an Order was entered by the Court which authorized the monitoring of wire communications of a telephone, referred to as Target Telephone # 4 ("TT #4"), belonging to the defendant, Santos Solis, Jr. Monitoring began on the same day and ended on October 20, 2005. Previously, agents of the federal Drug Enforcement Administration ("DEA") and other authorized personnel had monitored three other telephones, referred to as Target Telephones # 1 ("TT #1"), # 2 ("TT #2"), and # 3 ("TT #3"), belonging to Juan Valentin and James Cyree. The monitoring of these other telephones lasted approximately 114 days. The affidavits of probable cause for those three telephones were incorporated into the affidavit of probable cause for TT # 4. Additionally, statements obtained from the defendant on October 10, 2004 were also incorporated into the affidavit. The government has agreed to strike those statements from the affidavit for purposes of determining whether the TT #4 affidavit sets forth probable cause to issue the wiretap. Accordingly, those statements shall be excised from the affidavit for purposes of the defendant's second motion to suppress (Doc. 105).[1]

The affiant for the TT #4 affidavit was David Sowder, a Task Force Officer (TFO) with the DEA field office in Chattanooga, Tennessee. In the affidavit of probable cause for TT #4, Sowder included information on three intercepted calls between Solis and James Cyree on TT #2. His affidavit included the following information: Cyree was the user of TT #2. In the first call, on June

---

[1] The defendants' October 10, 2004 statements are found in one paragraph on pages 21 and 22 of the TT#4 affidavit. They begin with the second sentence of the last paragraph on page 21 ("Solis, Jr. stated that he was introduced....") and end with "the proceeds from drug sales" found in the same paragraph which continues on page 22.

3, 2005, Solis and Cyree merely discussed the fact that Cyree now had Solis' cell number and he could contact him when he desired (Aff. for TT #4 at 18). At this point, the DEA had accumulated a wealth of information on Cyree and his drug distribution activities. *Id*. at 14-16.

Later, on June 8, 2005, Solis and Cyree engaged in a much more overt phone call regarding drug distribution. Solis, after exchanging pleasantries with Cyree, stated "About thirty stuff I purchase." Cyree responded, "Yes, the thing is, I am about to go out of town this weekend and I cannot do nothing right now." Solis then stated to Cyree, "Is there someone you can back?" Cyree responded, "Look, I am going out of town for Friday, Saturday and Sunday. I will be back, you know what I'm saying." Cyree then explained that he would return on Monday and at that time they would "talk business for sure." Cyree ended the conversation by stating that he did not "want to be holding nothing while I am out of town." This conversation was recorded on TT #2. *Id*. at 18-19. In the affidavit, TFO Sowder (as the "affiant") explained the significance of the conversation on June 8, 2005:

> Based upon affiant's training and experience, and on the investigation thus far, affiant believes that the conversation between **SOLIS, Jr.** and **CYREE** is a conversation relating to controlled substances. For example, when **SOLIS, Jr.** discussed the "about thirty stuff I purchase," he is referring to a quantity of controlled substances he had available for sale to **CYREE**, most likely thirty pounds of marijuana. **CYREE**'s response, that he was going out of town, was his way of telling **SOLIS, Jr.** that he did not want to purchase controlled substances at that time. When **SOLIS, Jr.** asked **CYREE** "is there someone you can back," **SOLIS, Jr.** is requesting the name of someone **CYREE** trusts so **SOLIS, Jr.** can sell the controlled substances to him. **CYREE** then attempts to convince **SOLIS, Jr.** to hold on to the drugs as he would be back in a few days and at that time he would "talk business" with **SOLIS, Jr.** The fact that the conversation concerns controlled substances is confirmed by the last statement by **CYREE** that he did not "want to be holding nothing while I am out of town." Affiant believes that this statement is a reference to **CYREE** not wanting to be in possession of controlled substances any more than was necessary.

*Id*. at 19.

3

On July 25, 2005, Solis called Cyree. Cyree and Solis exchanged greetings and Solis reminded Cyree that they were going to "get back together." Solis then explained that he "bumped into something better." Cyree asked, "You got it right now?" Solis stated, "Not right now." Cyree then asked, "What's the ticket?," to which Solis responded, "Which one?" Cyree asked, "The girl and the green?" "Twenty-one," Solis stated. Cyree then asked "what about the green piece?" Solis responded "six and a half." Solis continued by saying, "It depends, too man, if you get a bunch it's like way less." Cyree asked, "How many I got to get to get them for five hundred?" Solis responded, "Whew, I guess over a hundred." *Id*. at 19-20. This conversation was also recorded on TT #2.

Again in the affidavit, TFO Sowder explained the significance of the conversation on July 25, 2005:

> Based upon affiant's training and experience, and based upon the investigation thus far, affiant believes that the above described conversation between **SOLIS, Jr.** and **CYREE** is a conversation relating to controlled substances. For example, when **SOLIS, Jr.** told **CYREE** the price on "the girl" was "twenty-one," he was telling **CYREE** in coded conversation that the price for a kilogram of cocaine was $21,000. Based upon the previous monitoring of **TARGET TELEPHONE # 2**, affiant is aware that **CYREE** frequently referred to powder cocaine as "girl." Additionally, when **SOLIS, Jr.** told **CYREE** the price on the "green piece" was "six and a half" he was explaining that the cost of the marijuana ("green piece") was $650 per pound. **SOLIS, Jr.** also stated that the price on the marijuana would remain the same unless **CYREE** purchased about 100 pounds and then the price would be lowered to $500.00 per pound. Based upon affiant's training and experience, these prices are consistent with the quantities of cocaine and marijuana discussed above.

*Id*.

In the affidavit, Sowder included other information, which was not the result of intercepted telephone calls, regarding the defendant. On February 4, 2004, Solis was arrested in Bedford County, Tennessee, by Director Tim Lane of the 17th Judicial Drug Task Force. At the time, Solis

4

had in his possession seven pounds of marijuana. *Id*. at 20-21. Sowder included the defendant's previous arrest with seven pounds of marijuana, *Id*. at 20, phone toll records from TT #4 reflecting calls to other phones of known drug distributors, *Id*. at 30-33, information from CS-1 regarding the defendant's drug distribution activities, *Id*. at 22-23, and information on the defendant's associates and their drug activities, *Id*. at 24-29.

In addition to the probable cause section, TFO Sowder included in his affidavit a ten-page section entitled "Unavailability of Alternative Investigative Techniques." *Id*. In this section, Sowder recounted the several procedures which are normally employed but were unavailable in this case, including: physical surveillance, use of grand jury subpoenas, interview of subjects or associates, search warrants, infiltration by undercover officers, use of cooperating individuals, purchase of cocaine by undercover officers or cooperating witnesses, review of telephone records, including pen register and trap and trace results, and pole cameras. TFO Sowder explained in the affidavit the ramifications of attempting every investigative technique listed in this section.

### III. Analysis

#### *A. Probable Cause*

The United States Court of Appeals for the Sixth Circuit has stated that "[t]he basic standards for a wiretap are similar to those for a search warrant, but there also must be strict compliance with Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520." *United States v. Alfano*, 838 F.2d 158, 161-62 (6th Cir. ), *cert. denied*, 488 U.S. 821 (1988); *see also United States v. Weinrich,* 586 F.2d 481, 487 (5th Cir.1978), *cert. denied*, 441 U.S. 927 (1979); *United States v. Feldman*, 535 F.2d 1175 (9th Cir.1976), *cert. denied*, 429 U.S. 940 (1976). The *Alfano* court further discussed what standards were necessary to be in compliance:

5

> That Act was enacted for the purpose of regularizing and controlling the issuance of warrants for wiretaps. At the same time, we are instructed that there is no specific formula that must be met for a warrant, and that evidence must be judged on the totality of the circumstances and in a reasonable and common sense manner. *Illinois v. Gates,* 462 U.S. 213, 238 (1983). Under this standard, the question that must be decided in issuing a warrant is whether there is probable cause to believe that evidence of a crime will be uncovered.

*Alfano*, 838 F.2d at 161-62. Stated another way, for the issuance of a wiretap order, probable cause is present if the totality of the circumstances reveals that there is a fair probability that a wiretap will uncover evidence of a crime. *United States v. Fairchild*, 189 F.3d 769, 775 (8th Cir. 1999); *United States v. Giacalone*, 853 F.2d 470, 478 (6th Cir.), *cert. denied*, 488 U.S. 910 (1988); *United States v. LaPuma*, No. 88-2237*2, 1989 WL 125242 (6th Cir. Oct. 23, 1989); *United States v. Gray*, 372 F. Supp. 2d 1025, 1039 (N.D. Ohio 2005).

In the instant case, there was more than a "fair probability" that evidence of a crime, namely drug distribution and a conspiracy to distribute drugs, would be uncovered by the monitoring of defendant's telephone. On June 8, 2005, and July 25, 2005, the defendant, using his telephone, engaged in conversation regarding drug distribution with James Cyree. The affidavit set forth the specific conversation used by the defendant and Cyree to arrange for drug transactions, including "quoted material" from the conversations. The affidavit also set forth Sowder's beliefs, based upon his training, experience and on the investigation up to that point, that the referenced telephone calls were in fact drug related. Additionally, as is outlined above, Sowder included the defendant's previous arrest with seven pounds of marijuana, Aff. for TT #4 at 20, 21, phone toll records from TT #4 to other phones of known drug distributors, *id*. at 30-33, information from CS-1 regarding the defendant's drug distribution activities, *id*. at 22-23, and information on the defendant's associates and their drug activities, *id.* at 24-29. Given the "totality of the circumstances," probable cause was

established in the affidavit for the wiretap.

Defendant also claims that "the government will not be able to prove some of the underlying facts asserted in the affidavit." (Defendant's memorandum at 1). Defendant does not expound further on this assertion, either in the motion or by way of affidavit.

A *Franks v. Delaware*, 438 U.S. 154 (1978) analysis applies to motions to suppress based upon alleged falsehoods or omissions in wiretap applications. *See, e.g., United States v. Bianco*, 998 F.2d 1112, 1126 (2d Cir. 1993), *cert. denied*, 511 U.S. 1069 (1994); *United States v. Mastroianni*, 749 F.2d 900, 909 (1st Cir. 1984); *United States v. Leisure*, 844 F.2d 1347, 1357 (8th Cir. 1988); *United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir. 1985). In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court held that the defendant has a substantial burden to overcome before an evidentiary hearing is required.

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any governmental informant. Finally, if these requirements are met, and if, when the material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support probable cause, no hearing is required.

*Franks*, 438 U.S. at 171.

Based upon the defendant's failure to meet the required showing, no evidentiary hearing on this matter was held. The defendant has not identified any statement by TFO Sowder which he

7

claims Sowder made knowing it was false or with reckless disregard for the truth. No offer of proof establishing the falsity of any statement in the affidavit has been made. No sworn statements of witnesses have been made and their absence has not been satisfactorily explained. Accordingly, the defendant has not met his threshold showing concerning *Franks* and is not entitled to have any information in the affidavit stricken for this reason. In sum, I conclude the affidavit set forth probable cause to issue the wiretap.

*B. Less Intrusive Means*

The defendant argues in his motion there is an "insufficient showing that the government actually considered employing less intrusive means of investigation." Also, the defendant states that the affidavit contains only "boilerplate language" referencing "numerous investigative procedures that...have been tried and failed." The affidavit's discussion of both unattempted and attempted techniques demonstrates the wiretap application was not "employed as the initial step in [a] criminal investigation," *United States v. Giordano*, 416 U.S. 505, 515 (1974), nor was it sought to be used "in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12 (1974). The application was sought as a further step to continue the investigation of the defendant's criminal activity where the traditional techniques had been deemed insufficient. The government, as required by 18 U.S.C. § 2518(1)(c), provided a detailed explanation of why the traditional techniques were either inadequate when used or would not suffice if used. Accordingly, the government met the necessity standard for the wiretap to be granted.

In the orders authorizing the electronic surveillance, this Court made the determination that there was sufficient information contained in TFO Sowder's affidavit to comply with the necessity

8

requirements of 18 U.S.C. § 2518(1)(c) and (3)(c). A wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this presumption. *United States v. Quintana*, 70 F.3d 1167, 1169 (10th Cir. 1995); *see also Franks*, 438 U.S. at 171 ("There is of course, a presumption of validity with respect to the affidavit supporting the search warrant"). The Sixth Circuit explained the requirements of the necessity provisions for the Title III statute in *United States v. Lambert*, 771 F.2d 83 (6th Cir. 1985).

> These provisions do not require that the police officials exhaust every conceivable non-wiretap investigative technique. All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been nor will likely be inadequate.

*Lambert*, 771 F.2d at 91 (citations omitted), *cert. denied*, 474 U.S. 1034 (1985), *accord United States v. Stewart*, 306 F.3d 295, 306 (6th Cir. 2002), *cert. denied*, 537 U.S. 1138, 537 U.S. 1146, 538 U.S. 1036 (2003). This was done in Sowder's affidavit. For example, Sowder detailed that while physical surveillance of the defendant was possible, it was of limited value. Aff. for TT # 4 at 35-36. Sowder also discussed the possibility of physical surveillance being compromised based upon the defendant's location and the number of individuals sympathetic to the defendant. Moreover, given the inherent limitations of physical surveillance, the investigators could not capture every meeting or all of the conduct engaged in by the participants.

Interviewing subjects or subpoenaing them to the grand jury was also considered. It was rejected since it would alert the subjects to the investigation and could result in the destruction of evidence or harm to confidential informants. *Id.* at 38-41.

The use of undercover agents was considered and rejected due to the anticipated inability of an undercover agent to penetrate the tight-knit relationship of the group. *Id.* at 42.

9

The use of search warrants as a technique was limited by the lack of information concerning the locations where evidence of criminal activity was located. *Id.* at 41-42. Their premature use could have exposed the existence of the investigation and limited the ability to collect further evidence. Moreover, the ownership and control of evidence seized at locations would not necessarily have been ascertained by the use of search warrants, which would not have allowed law enforcement to establish the scope of the conspiracy or many of its participants. *Id*. at 41.

Confidential informants and controlled buys were used in this case. However, as Sowder noted in his affidavit, "no confidential source has demonstrated an ability to purchase controlled substances directly from" the defendant. *Id.* at 44. Also, as Sowder noted, "much of the probable cause contained in this affidavit resulted from intercepted calls from TT #2, not from purchases by confidential informants." *Id*. at 44.

Telephone records, including pen registers and trap and trace devices were used and were helpful. However, these types of records, without more, are limited in evidentiary value since they do not reveal the identities of the individuals making or receiving the telephone calls and are unable to provide the contents of the conversation. *Id.* at 44-45.

The consideration of these investigative alternatives, and the investigator's belief that they would not be adequate, satisfied the requirements of 18 U.S.C. §2518(1)(c). *Alfano*, 838 F. 2d 158; 163-64; *Lambert*, 771 F.2d at 91; *LaPuma*, 1989 WL 125242, at 3.

With respect to the defendant's complaint that the affidavit "contains only boilerplate language" regarding the methods the government considered using but did not, the undersigned must disagree. Certainly, as the government admits, Sowder used a similar format for this affidavit as he did for the other affidavit used to obtain wiretaps. Affiant Sowder also explains why each method

10

of investigation less intrusive than wiretapping was either inadequate or would be inadequate *in this particular situation*. Consequently, I conclude the ten-page section of the affidavit detailing the shortcomings of alternative means of investigation was sufficient to satisfy the "exhaustion" requirements of the Title III statute and its accompanying case law. The *Lambert* requirement of "serious consideration" is satisfied, whether a particular technique was actually used. *See Lambert*, 771 F.2d at 91.

IV. Conclusion

For the foregoing reasons, it is RECOMMENDED the defendant's motions to suppress, (Docs. 104 and 105) be DENIED.[2]

                                              s/William B. Mitchell Carter
                                              UNITED STATES MAGISTRATE JUDGE

---

[2] Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).